[1] We recognize that these two cases carry slightly different spellings for this party's name. These case styles reflect the spellings in the records.
This case arises out of property damage incurred when the roof of Brewbaker Junior High School in Montgomery leaked. The Montgomery County Board of Education *Page 170 
(hereinafter "the School Board") filed this action against Bear Brothers, Inc., the general contractor; United States Mineral Products Company (hereinafter "U.S. Mineral"), the manufacturer of the roofing membrane; and W. Murray Watson, W. Michael Watson, and J. Michael Rutland, the architects for the school project. Bear Brothers joined Dixie Roof Decks, Inc. (hereinafter "Dixie"), the roofing subcontractor, as a third-party defendant. The trial court substituted the corporate entity Watson, Watson, Rutland/Architects, Inc. (hereinafter "the Architect"), for the individually named architects.
The School Board alleged negligence and breach of contract against the Architect and breach of contract and breach of guaranty against the Bear Brothers and U.S. Mineral. The Architect filed a cross-claim against U.S. Mineral and Dixie for indemnity in case the Architect were held liable to the Board. The trial court entered summary judgment for U.S. Mineral and Dixie on that cross-claim, holding that a one-year statute of limitations applied to that cross-claim and that the statute barred the claim.
The School Board settled with Bear Brothers and U.S. Mineral for a total of $100,000. At trial against the Architect, the court granted the Architect's motion for a directed verdict as to the School Board's negligence claim, on the ground that the statute of limitations had expired. The breach of contract claim was submitted to the jury, and the jury returned a verdict of $24,813.08 against the Architect. The court entered a judgment based on that verdict.
The Architect appealed from that portion of the judgment based on the verdict in favor of the School Board and from the dismissal of its cross-claim against U.S. Mineral and Dixie. The School Board then cross-appealed from that portion of the trial court's judgment based on the Architect's directed verdict on the negligence claim.
At the center of this dispute is the architectural agreement between the Architect and the School Board; it included the following language:
 "ARTICLE 8. Administration of the Construction Contract. The Architect will endeavor to require the Contractor to strictly adhere to the plans and specifications, to guard the Owner against defects and deficiencies in the work of Contractors, and shall promptly notify the Owner in writing of any significant departure in the quality of materials or workmanship from the requirements of the plans and specifications, but he does not guarantee the performance of the contracts.
"* * * *
 "The Architect shall make periodic visits to the site and as hereinafter defined to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. On the basis of his on-site observations as an Architect, he shall endeavor to guard the Owner against defect and deficiencies in the work of the Contractor. The Architect shall not be required to make continuous on-site inspections to check the quality of the Work. Architect shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, unless spelled out in the Contract Documents, and he shall not be liable for results of Contractor's failure to carry out the work in accordance with the Contract Documents.
"* * * *
 "The Architect shall not be responsible for the acts or omissions of the Contractor, or any Subcontractors, or any of the Contractor's or Subcontractor's agents or employees, or any other persons performing any of the Work."
The following issues respectively have been argued orally and in the parties' briefs:
On the Architect's appeal:
 (1) Does the exculpatory language in the architectural agreement absolve the Architect from liability for damages arising from the failure of the contractor to follow the plans and specifications? *Page 171 
 (2) If the answer to Issue 1 is no, then is the Architect entitled to cross-claim for indemnity against the roofing subcontractor and the manufacturer of the roofing membrane?
On the School Board's cross-appeal:
 (3) When did the statutory period of limitations applicable to the school board's negligence claim begin to run?
 I
The Architect argues that the exculpatory language in Article 8 of the architectural agreement absolves the Architect from liability to the School Board because all roof leaks involved were attributable to the faulty workmanship of the contractor. The Architect points out that Article 8 provides for two types of inspection services by the Architect; that is, the owner could elect to receive only general site inspections by the Architect, or the owner could elect to pay an additional fee for continuous on-site inspections (known as the "clerk of the works" alternative); the School Board elected not to pay for the second option.[2]
This Court has construed language virtually identical to that at issue here, in Sheetz, Aiken Aiken, Inc. v. Spann, Hall,Ritchie, Inc., 512 So.2d 99 (Ala. 1987). In that case, the contract in question contained the following language:
 "The ARCHITECT shall not be responsible for the acts or omission of the contractor, or any subcontractors, or any other contractor or subcontractors, agents or employees, or any person performing any work."
The Court, in Sheetz, stated: "The contract expressly states that Spann is not responsible in any fashion for the acts or omission of the contractor, subcontractors, agents, or employees performing the work." 512 So.2d at 102.
A case analogous to this one is Moundsview Indep. SchoolDist. No. 621 v. Buetow Associates, Inc., 253 N.W.2d 836
(Minn. 1977), where the contract language regarding inspection duties was virtually identical to that used here; the trial court entered a summary judgment for the architect, and the Minnesota Supreme Court affirmed. The supreme court found it significant that the school district had elected not to obtain continuous supervisory services from the architect through the "clerk of the works" clause. The court held that the contractual provisions "absolved [the architect] from any liability, as a matter of law, for a contractor's failure to fasten the roof to the building with washers and nuts." 253 N.W.2d at 839.
Other courts have also held that similar language absolved the architect from liability as a matter of law. See Mayor City Council of the City of Columbus v. Clark-Dietz Associates-Engineers, Inc., 550 F. Supp. 610 (N.D.Miss. 1982);Shepard v. City of Palatka, 414 So.2d 1077 (Fla.Dist.Ct.App. 1981); Vonasek v. Hirsch Stevens, Inc., 65 Wis.2d 1,221 N.W.2d 815 (1974); J J Electric, Inc. v. Gilbert H. Moen Co.,9 Wn. App. 954, 516 P.2d 217 (1973); contra, Hunt v. Ellisor Tanner, Inc., 739 S.W.2d 933 (Tex.Dist.Ct.App. 1987), in which the Texas court refused to follow the decision of the Minnesota Supreme Court in Moundsview.
The Architect contends that imposition of liability upon it here would be nothing short of a holding that the Architect was the guarantor of the contractor's work.
The School Board responds to the Architect's argument by saying that it has never contended that the Architect should be a guarantor of the contractor's work, but the School Board strongly contends that where a contract is for work and services, there is an implied duty to perform with an ordinary and reasonable degree of skill and care, citing C.P. Robbins Associates v. Stevens, 53 Ala. App. 432, 301 So.2d 196 (1974). The School Board also argues that its claim was covered under the terms of the agreement because its claim was limited to those deviations from the plans and specifications that should have been obvious *Page 172 
to one skilled in the construction industry. According to the School Board, if the Architect's construction of the contract language is accepted, the Architect would not be accountable to anyone for its failure to make a reasonably adequate inspection so long as it made an "inspection," no matter how cursory, on a weekly basis.
The School Board points out that the contract also included the following language:
 "On the basis of his on-site observations as an Architect, he shall endeavor to guard the Owner against defects and deficiencies in the work of the Contractor."
----------------------
 "The Architect shall have authority to reject Work which does not conform to the Contract Documents."
----------------------
 "The administration of the contract by the Architect is not normally to be construed as meaning the furnishing of continuous inspection which may be obtained by the employment of a Clerk of the Works. However, the administration shall be consistent with the size and nature of the work and must include, at least, one inspection each week, a final inspection, and an inspection at the end of the one year guarantee period shall be required on all projects."
It is apparent that our focus must be drawn to the exculpatory language contained in Article 8 of the agreement. Most courts in other jurisdictions that have considered similar exculpatory clauses have recognized that while such clauses do not absolve an architect from all liability, an architect is under no duty to perform continuous inspections that could be obtained by the employment of a "clerk of the works."
The critical question in most of the cases we have reviewed from other jurisdictions seems to focus on the extent of the obligation owed when an architect agrees to perform the type of inspection that the architect agreed to perform in this case. Some of the courts hold, as a matter of law, that the agreement does not cover particular factual situations, and at least one court makes a distinction based on whether a failure of a contractor to follow plans and specifications is known to thearchitect during the course of the construction.
A fair reading of Article 8 obviously operates to impose certain inspection responsibilities upon the architect to view the ongoing construction progress. The frequency and number of such inspections is made somewhat specific by the contractual requirement that these visits to the site be conducted at least once each week. The difficulty arises in construing the particular terminology used, such as "endeavor to require," "familiarize himself generally with the progress and quality of the work," and "endeavor to guard the owner against defect and deficiencies." When coupled with the contract language stating that "[t]he administration of the contract by the Architect is not normally to be construed as meaning the furnishing of continuous inspection which may be obtained by the employment of a Clerk of the Works," these phrases make it obvious that the Architect's duty to inspect is somewhat limited, but we cannot agree with the argument on appeal that there could never be an imposition of liability under an agreement similar to Article 8 no matter how serious the deviation of the contractor from the plans and specifications.
We begin our interpretation of Article 8 by stating the general rule that one must look at the contract as a whole in order to determine the intent of the parties. Charles H.McCauley Associates, Inc. v. Snook, 339 So.2d 1011 (Ala. 1976). In this case, the School Board presented some evidence by persons knowledgeable of construction practices, and they testified concerning the cause of the leaks and gave general testimony concerning the conditions at the construction site, which, they allege, should have put the Architect on notice that the plans and specifications were not being followed. However, the only testimony in the record we find concerning the obligation of the Architect to conduct an inspection pursuant to the *Page 173 
agreement was to the effect that, according to one architect/witness who had read the agreement, it did not call for an inspection to discover the defect alleged in this case.
Some courts have determined, as a matter of law, that certain factual situations are not covered under an agreement to inspect like that agreement involved here, and some courts have emphasized that the contract is one with a professional and have appeared to apply a rule requiring the presentation of expert testimony in order to prove the contract meaning. For example, the Moundsview court said, "An architect, as a professional, is required to perform his services with reasonable care and competence and will be liable in damages for any failure to do so." 253 N.W.2d at 839. In Clark-Dietz, supra, the court held that the architect's liability was limited by the contract language, but also held that the architect still had a duty to supervise construction by observing the general progress of the work. The court did not impose liability on the architect, because it explicitly found that the architect had not been negligent in its limited duties.
The same AIA contract language was involved in First Nat'lBank of Akron v. Cann, 503 F. Supp. 419 (N.D. Ohio 1980), aff'd,669 F.2d 415 (6th Cir. 1982), where the court wrote:
 "That exhaustive, continuous on-site inspections were not required, however, does not allow the architect to close his eyes on the construction site, refrain from engaging in any inspection procedure whatsoever, and then disclaim liability for construction defects that even the most perfunctory monitoring would have prevented."
503 F. Supp. at 436.
Although the contract here clearly made the Architect's inspection duty a limited one, we cannot hold that it absolved the Architect from all possible liability or relieved it of the duty to perform reasonably the limited contractual duties that it agreed to undertake. Otherwise, as the School Board argues, the owner would have bought nothing from the Architect. While the agreement may have absolved the Architect of liability for any negligent acts or omissions of the contractor and subcontractors, it did not absolve the Architect of liability arising out of its own failure to inspect reasonably. Nor could the Architect close its eyes on the construction site and not engage in any inspection procedure, and then disclaim liability for construction defects that even the most perfunctory monitoring would have prevented, or fail to advise the owner of a known failure of the contractor to follow the plans and specifications.
The issue here is whether the Architect can be held liable for its failure to inspect and to discover the acts or omissions of the contractor or subcontractors in failing to follow the plans and specifications. Under the terms of the contract, the Architect had at least a duty to perform reasonable inspections, and the School Board had a right to a remedy for any failure to perform that duty. There is no question that the Architect performed inspections; the thrust of the School Board's argument is that these inspections were not as thorough as the Architect agreed they would be.
As we have already stated, the only evidence concerning the Architect's duty under the agreement was from an architect who stated that under his interpretation of the contract the Architect was not under a duty to inspect for the specific defect that was alleged in this case.
As was pointed out in Moundsview, an architect is a "professional," and we are of the opinion that expert testimony was needed in order to show whether the defects here should have been obvious to the Architect during the weekly inspections. Just as in cases dealing with an alleged breach of a duty by an attorney, a doctor, or any other professional, unless the breach is so obvious that any reasonable person would see it, then expert testimony is necessary in order to establish the alleged breach. The nature and extent of the duty of an architect who agrees to conduct the inspection called for by the subject agreement are not matters of common knowledge. The rule *Page 174 
of law in Alabama concerning the use of expert testimony is as follows: " '[E]xpert opinion testimony should not be admitted unless it is clear that the jurors themselves are not capable, from want of experience or knowledge of the subject, to draw correct conclusions from the facts. The opinion of the expert is inadmissible upon matters of common knowledge.' "Wal-Mart Stores, Inc. v. White, 476 So.2d 614, 617 (Ala. 1985) (quoting C. Gamble, McElroy's Alabama Evidence § 127.01(5) (3d ed. 1977)).
The breach alleged in this case involved architectural matters that would not be within the common knowledge of the jurors, yet the School Board presented no expert testimony regarding the Architect's inspections and any deficiencies in those inspections. The School Board presented no expert testimony regarding the standard of care imposed within the architectural profession by the weekly inspection provision contained in this contract, and there was no expert evidence that that standard was breached by the Architect. In fact, the only expert that testified concerning the "weep holes" (which were the source of the leaks) was an architect who stated that it was not within the standard of care under the weekly inspection provision to keep track of each and every weep hole.
In a case startlingly similar to this one, a New York court, while holding that an architect could be found liable under the AIA contract for a failure to notify the board of education about leaks in a school's roof, did so only after finding that there was evidence that the architect had knowledge during the course of the construction that the contractor was not following the plans and specifications. In Board of Educ. ofHudson City School Dist. v. Sargent, Webster, Crenshaw Folley, 146 A.D.2d 190, 539 N.Y.S.2d 814, 817-18 (1989), the court stated:
 "While this very clause in the standard AIA architect/owner contract [the clause absolving the architect from responsibility for the contractor's failures] has been given exculpatory effect in this State and other jurisdictions (see, Jewish Bd. of Guardians v. Grumman Allied Inds., 96 A.D.2d 465,467, 464 N.Y.S.2d 778, affd, 62 N.Y.2d 684, 476 N.Y.S.2d 535, 465 N.E.2d 42; Shepard v. City of Palatka, 414 So.2d 1077 [Fla. Dist. Ct. App. 1981]; Moundsview Ind. School Dist. No. 621 v. Buetow Assoc., 253 N.W.2d 836 [Minn. 1977]), none of the cases involved defects known by the architect during the course of construction, which he failed to apprise the owner of under the contractual duty to 'keep the [School District] informed of the progress of the work'. We decline to extend the application of the clause in question to an instance such as this, where the trier of facts could find that the architect was aware of the defect and failed to notify the owner of it." (Emphasis added.)
The key distinction between that case and this one is that inSargent, Webster there was evidence that the architect knew of the defects during construction and failed to notify the owner. Clearly, the architect there would have breached his contractual duty if he failed to notify the owner of a known
defect. It is undisputed in this case that during construction the Architect did not know of the defects with the weep holes. In fact, the School Board does not suggest that the Architect did know, only that under the provisions of the contract the trier of fact could have found that the Architect should have conducted an inspection that would have discovered the defect.
We conclude that, although the Architect had a duty under the contract to inspect, exhaustive, continuous on-site inspections were not required. We also hold, however, that an architect has a legal duty, under such an agreement, to notify the owner of a known defect. Furthermore, an architect cannot close his eyes on the construction site and refuse to engage in any inspection procedure whatsoever and then disclaim liability for construction defects that even the most perfunctory monitoring would have been prevented. In this case, we hold, as a matter of law, that the *Page 175 
School Board failed to prove that the Architect breached the agreement.
In making this judgment, we would point out the value, and in some cases, the necessity, for expert testimony to aid the court and the trier of fact in resolving conflicts that might arise.
 II
We now address the School Board's argument on its cross-appeal that the negligence claim should have been submitted to the jury. The School Board stated at oral argument that its negligence claim was asserted as an alternate theory of recovery in case its contract claim was not allowed. The trial court ruled that this negligence claim was barred by the statute of limitations.
This Court has stated that a negligence cause of action accrues as soon as the plaintiff is entitled to maintain the action, i.e., at the time of the first legal injury, regardless of whether the full amount of damages is apparent.Armstrong v. Life Ins. Co. of Virginia, 454 So.2d 1377 (Ala. 1984). The alleged negligent acts of the Architect — improper inspection of the work — occurred during the course of the construction project and could not have occurred after the completion of the project in August 1982. The claimed damage manifested itself during the latter stages of construction and continued from 1982 through the date of trial. By April 1985, the School Board knew that litigation over the leaks was likely; yet, the School Board did not file suit until July 1987. Regardless of whether the statutory limitations period commenced to run upon the commission of the allegedly negligent acts (1981-1982), on the date when the damage first manifested itself (June 1982), or on the date when the School Board reasonably knew that it would file suit (April 1985), the filing of this action in July 1987 was clearly tardy, coming, under any view, more than two years after the accrual of the cause of action. Thus, it is not necessary to determine whether the two-year statute of limitations (Ala. Code 1975, § 6-2-38) applies, or whether its predecessor applies (the one-year statute, § 6-2-39, repealed effective January 9, 1985).
The trial court was correct, therefore, in directing a verdict for the Architect on the School Board's negligence claim.
 III
Because we hold for the Architect on the School Board's contract and negligence claims, we determine that the issue of whether the Architect should be allowed to assert its cross-claim against the roofing subcontractor and the manufacturer of the roofing membrane is moot.
 IV
For the above-stated reasons, that portion of the judgment based on the jury's verdict against the Architect on the School Board's contract claim is reversed, and a judgment is rendered for the Architect on that claim. That portion of the judgment based on the directed verdict in the Architect's favor on the School Board's negligence claim is affirmed.
88-220 REVERSED AND JUDGMENT RENDERED.
88-273 AFFIRMED.
HORNSBY, C.J., and JONES, SHORES, HOUSTON and STEAGALL, JJ., concur.
[2] Article 8 is modeled after language found in American Institute of Architects (AIA) contracts used throughout the country.